UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

——————————————————————————
)
ALEXANDRA JOSEPH, on behalf of herself and )   Case No. 11 - 10369
all others similarly situated,                    )
)
         Plaintiff,                        )
)
v.                                               )            .
)   COMPLAINT
BANK OF AMERICA, N.A. ,                           )
and                                              )
BAC HOME LOANS SERVICING, LP,                     )
)
        Defendants.                       )
——————————————————————————)

## INTRODUCTION

1.      Alexandra Joseph brings this suit on behalf of herself and a class of similarly situated Massachusetts residents ("Plaintiffs") to challenge the failure of Defendants Bank of America, N.A. and BAC Home Loans Servicing, LP. (referred to herein collectively as "Bank of America" and or "Defendants") to honor its written agreement with a specific group of homeowners to permanently modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.      In 2008, Bank of America accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. On April 17, 2009, Steve R. Bailey, Senior Vice President of Bank of America signed a contract with the U.S. Treasury agreeing to participate in HAMP -- a program in

which Bank of America received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

3.     In the ordinary course of its participating servicer agreement and in compliance with the rules and regulations of HAMP, Bank of America entered into written agreements with the plaintiff class members for temporary trial modifications. Plaintiffs, for their part, performed under their temporary trial modification agreements.

4.     As a result, and pursuant to the HAMP rules and regulations, Bank of America sent written letters to each and every class member, stating that they had been approved for a permanent loan modification.  These approvals (1) acknowledged that the Plaintiffs had satisfied all of their requirements under the trial plan to obtain a permanent modification, (2) confirmed to each Plaintiff class member that they had, indeed, been approved for a permanent modification, (3) stated that the Plaintiff class members would receive the final documents evidencing the approved  modification, and (4) advised the Plaintiff class members to continue making the reduced trial plan payments, pending receipt of the documents evidencing the agreement.

5.     The Plaintiffs continued to make monthly payments to Bank of America, pending receipt of the documents evidencing their accepted HAMP modifications. Notwithstanding its written agreements, Bank of America breached its legal obligation to perform its contracts and to document the permanent loan modification agreements Rather, months after "permanently approving" the class members for loan modifications, Bank of America unlawfully breached its promised permanent HAMP loan modifications and, either orally or in writing, advised the class members that their accepted offers for permanent HAMP loan modifications were, in fact, now rescinded.

6.     Upon information and belief, as a result, hundreds, if not thousands, of Massachusetts homeowners, to whom Bank of American had contracted for permanent loan modifications, lost their rights to their federal HAMP loan modifications that would have cured their mortgage delinquencies, advantageously modified the terms of their loan, and saved their homes from foreclosure.  Defendant's actions violate the HAMP guidelines and constitute a breach of contract that can only be properly cured by specific performance.   In the alternative, Defendant's conduct supports actionable claims for damages under the theories of breach of contract, promissory estoppel, and negligence.

## JURISDICTION

7.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because the action is between parties that are citizens of different states and the amount in controversy between the named plaintiff and the defendant is greater than $75,000.  For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate.   *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006).  Bank of America is, on information and belief, a citizen of North Carolina.  Plaintiffs are citizens of Massachusetts.  BAC Loan Servicing, LP's main office is in Plano, Texas.

8.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that it is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

9.     In addition, the court can exercise federal subject matter jurisdiction over this action as the claims and controversies contained herein can be deemed to arise under

the federal regulations and guidelines pertaining to the federal government's HAMP program.

10.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants regularly conducts business in this District, and the named Plaintiffs reside in this District.

## PARTIES

11.     Alexandra Joseph is an individual residing at 18 McCall Street, Medford, Massachusetts, 02155.

12.     Defendant Bank of America, N.A. is a national banking association with its principal place of business located at 101 Tryon Street, Charlotte, North Carolina.  At all times material hereto, Bank of America, N.A. was a corporation registered to do and doing business in the Commonwealth of Massachusetts.

**13.**     Defendant BAC Home Loans Servicing, LP ("BAC") is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302, managed and controlled by Bank of America who services loans for Bank of America and other banks and investors.

## FACTUAL BACKGROUND

### *Creation of the Home Affordable Modification Program*

14.     In response to the growing foreclosure crisis, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with

the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C.A. §5201 *et. seq.* (2009).

15.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."  12 U.S.C.A. §5201.

16.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. §5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.  *Id.*

17.     Congress allocated up to $700 billion the from the United States Department of the Treasury for TARP.  12 U.S.C. §5225.

18.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. §5213(3).

19.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C.A. §5219.

20.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."  *Id.*

21.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C.A. §5220.

22.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

23.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal negative equity in their home, and is known as the Home Affordable Refinance Program, or HARP.

24.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is this subprogram that is at issue in this case.

25.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion  for HAMP, of which at least $50 billion is TARP money.

26.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

### The Role of the Servicer

27.     The industry entities that perform the actual interface with borrowers - including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure - are known as "servicers."  Servicers typically act as the agents of the entities

that hold mortgage loans.  Bank of America is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

28.      Should a servicer elect to participate in HAMP,[1] they execute a Servicer Participation Agreement ("SPA") with the federal government.

29.      On August 17, 2009, Steve R. Bailey, Senior Vice President of Bank of America, executed an SPA, thereby making Bank of America a participating servicer in HAMP.  A copy of this SPA is attached as Exhibit 1.

30.      The SPA executed by Bank of America incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation" (SPA 1.A), and are incorporated herein by reference.

31.      The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." (SPA 1.A., 2.A.)[2]

---

[1] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program, are subject to mandatory inclusion in HAMP.  Otherwise, participation by servicers in the HAMP program is voluntary.

[2] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation -- Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).  These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as herein.

32.     The Program Documentation requires Participating Servicers to evaluate *all loans* that are 60 or more days delinquent for HAMP modifications.  (SD 09-01 p.4). In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

33.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").[3]  The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

34.     Bank of America offers TPP's to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

35.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

36.     Upon information and belief, Bank of America sent thousands of written notifications to homeowners, including the Plaintiff, notifying them that they had

---

[3] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

successfully satisfied the requirements of the TPP and that they had, therefore, been approved for a permanent modification.  Bank of America advised the homeowners to be on the look-out for the paperwork that would evidence the permanent modification was in place, and to continue making monthly payments equal to those of the trial payments.

37.     Plaintiff, and others like her, continued to make payments as required and advised by Bank of America after receiving the notice that they had been approved for a permanent loan modification.    Some time thereafter, Plaintiff, and others like her, were ultimately advised, either verbally or in writing, that their loan modification was being denied, in breach of the prior, existing contract.

38.     By failing to live up the TPP Agreement, and subsequent permanent notification, Bank of America is not only subjecting homeowners to foreclosure and homelessness, it has accepted payments for months on end that homeowners could have used to  fund bankruptcy plans, relocation costs, short sales, or other means of curing their default.

### *Alexandra Joseph*

39.     Alexandra Joseph has owned 18 McCall Street in Medford, Massachusetts since February 5, 2007.  At the time that Ms. Joseph purchased the property, she took out a $237,500 mortgage loan (hereinafter the "Mortgage Loan") from America's Wholesale Lender.[4]

40.     The servicing of the Plaintiff's Mortgage Loan was transferred to the Defendant BAC Home Loans Servicing, LP., sometime after February 5, 2007 and continues to this date.

---

[4] See Mortgage, attached hereto as Exhibit 6.

41.    Ms. Joseph lives at the house with her 5-year old daughter and sister. After taking out the loan, she lost one of her jobs that paid her a higher income. While she continues to work two jobs, the financial hardship resulting from the loss of income caused her to experience difficulty making payments on her mortgage loan and resulted in her falling behind on her payments.

42.    Around June of 2009, Ms. Joseph applied for a HAMP loan modification.

43.    On or around September, 2009,  Bank of America offered Ms. Joseph a TPP Agreement entitled *Home Affordable Modification Trial Period Plan* (hereinafter Trial Period Plan or TPP).  A copy of the letter accompanying the TPP Agreement is attached hereto as Exhibit 7.  Ms. Joseph timely accepted this offer by executing the TPP Agreement and returning it to BAC.  Ms. Joseph also provided BAC with the Hardship Affidavit, IRS Form 4506-T, payment and other required documentation, in a timely manner.

44.    The TPP Agreement provided that the plan was effective October 1, 2009, and would run from October 1, 2009 to December 1, 2009.  Ms. Joseph's monthly mortgage payments (Principle, Interest, Taxes and Insurance) were reduced to $1,229.26/month under the TPP.  The first sentence of the TPP agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects[5], then the Lender will provide me with a Loan

---

[5] The representations in Section 1 of the TPP made by the homeowners, including Ms. Joseph, are that (1) they are either in default or will soon be in default without sufficient income or access to liquid assets to make their monthly payments; (2) they live in the property as their principal residence; (3) there has been no change in ownership; (4) they have, or are, providing documentation for all income received; (5) the information they are providing is true and correct; and (6) they will obtain credit counseling, if required by the servicer.

Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

45.     Ms. Joseph timely made each of the payments provided for in the TPP Agreement, due in October, November, and December, 2009.    Additionally, her representations made in Section 1 of the TPP continued to be true in all material respects. At the expiration of the Trial Period, at the advice of BAC representatives, Ms. Joseph continued to make monthly payments in the amount prescribed in the TPP, while she awaited her permanent modification notification.    Finally, on March 30, 2010, Ms. Joseph received a written form letter from Defendant BAC Home Loans Servicing, LP., stating, "**You qualify for a permanent modification of your home loan under the Home Affordable Modification Program**." (emphasis in original).  See attached hereto as Exhibit 8.[6]   The letter states further:   "[w]e are in the process of preparing your Agreement and will be sending it to you soon.  Please be on the lookout for the package in the mail..."

46.     Additionally, the Defendant "strongly encourage[d the Plaintiff] to continue making monthly mortgage payments in the amount of [her] trial period payments", noting a failure to do so could negatively impact her credit and have adverse consequences on the permanent modification.  Id.

---

[6] The letter also acknowledged that the Plaintiff had performed all that was required of her under the TPP, thanking her "for meeting the terms of your Home Affordable Modification Trial Period Plan by providing your financial information and making your trial payments."

47.     Ms. Joseph continued to make her monthly payments, as instructed.   As time passed, she continually called Defendant to check on the whereabouts of her final paperwork, contacting the Defendant typically 2 to 3 times per month.   Each time she called Defendant, Ms. Joseph was assured everything was all set, the paperwork was still in the process of being produced, it would arrive shortly, no additional documentation was required, and or she was instructed to continue making her monthly payments.

48.     Ms. Joseph continued making timely payments until February of 2011, when Defendant informed her it would no longer be accepting her payments.   Until that time, each payment had been received, accepted and cashed by the Defendant.

49.     Notwithstanding Defendant's agreement, its conduct, and its continuing acceptance of Plaintiff's monthly payments, it verbally informed Ms. Joseph in October of 2010 that she was being declined for a permanent HAMP modification.   After several follow up inquiries by Ms. Joseph requesting a written explanation, a declination letter was finally sent to her from Defendant on November 22, 2010.   Attached hereto as Exhibit 9.

50.     The declination letter states that the permanent modification was being declined because it failed the Net Present Value (NPV) test.   As explained within the letter, "this means that the loan modification should be in the financial interest of the investor that owns your loan.   Based on the NPV results the owner of your loan has not approved a modification."

51.     Nowhere in the TPP, or approval letter, is there any mention that the permanent modification is, or was, contingent upon the passing of a NPV test.   On the contrary, all contingencies within Ms. Joseph's control were satisfied.   She made the

required payments, executed the required paperwork, provided the supporting documents that were asked for, and the Modification Effective Date had passed.   All of this is undisputed, per the approval letter sent by the Defendant in March, 2010.

52.   Moreover, the NPV test results were based on data from September, 2009. See Exhibit 9, enumerating the "Available NPV Inputs", including "Unpaid balance on the original loan as of 9/11/2009", "Interest rate before modification as of 9/11/2009", and "Months delinquent as of 9/11/2009".  In other words, the test used data from *before* Ms. Joseph was approved for the TPP, and before the permanent modification that occurred nearly seven months later.

53.   Based on information and belief, BAC sent hundreds, if not thousands, of other homeowners that had completed the TPP the same approval letter, indicating that they had qualified for a permanent loan modification.   BAC continued to accept payments from those homeowners, only to later advise them orally or in writing that their contracts were being breached by Defendant, and instead the homeowners was being denied for a permanent loan modification.

### *Class Allegations*

54.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

55.   This class action is brought by the Plaintiffs on behalf of themselves and all Massachusetts homeowners whose loans have been serviced by Defendant and who, since August 17, 2009, have complied with their obligations under a written TPP Agreement and subsequently received an approval letter notifying them that they qualified for a permanent modification, and were then later denied for the promised permanent modification.

56.     Plaintiff sues on her own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

57.     Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of the Defendant. Plaintiff believes that the class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendant's books and records.  Therefore, the proposed class is so numerous that joinder of all members is impracticable.

58.     Based on the size of the modifications at issue, Plaintiff believes the amount in controversy exceeds $5 million.   In the alternative, Plaintiff believes the amount in controversy exceeds $5 million based on the equity loss that could result to putative class members if they were to lose their homes to foreclosure as a result of Defendant's failure to convert temporary modifications into permanent modifications. Additionally, Plaintiff believes the amount in controversy exceeds $5 million, based on the amount paid to Defendant by the putative class members, to their detriment, in reliance of the promises by the Defendant, both in writing and orally, that their loans had been permanently modified.

59.     All members of the class have been subject to and affected by the same conduct.  The claims are based on form contracts, uniform loan modification processing requirements, and form acceptance letters.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

    a.  the nature, scope and operation of Defendant's obligations to homeowners under HAMP;

b.      whether Defendant's receipt of an executed TPP Agreement, along with supporting documentation and a minimum of three monthly payments, followed by a letter from the Defendant to the homeowner acknowledging that the homeowner had qualified for a permanent modification, along with  the continued monthly payments made by the homeowner and accepted and applied by the Defendant, creates a binding contract or otherwise legally obligates Defendant to offer class members a permanent HAMP modification;

c.      whether Defendant's failure to honor its promise to permanently modify the loans in question, notwithstanding the letter stating the loans qualified for a permanent modification, amounts to a breach of contract and/or breach of the covenant of good faith and fair dealing;

d.      whether Plaintiffs can recover under the theory of detrimental reliance for payments made, after the expiration of the time period in the applicable TPP's, in reliance of the written and oral statements of the Defendant;

e.      whether the Court can order the Defendant to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

60.    The claims of the individual named Plaintiff are typical of the claims of the class and do not conflict with the interest of any other members of the class in that

both the Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement, received the same approval letter, and were later met with the same declination of a permanent modification.

61.     The individual named Plaintiff will fairly and adequately represent the interests of the class.  She is committed to the vigorous prosecution of the class' claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions - in particular, consumer protection actions.

62.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

63.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

64.     The Defendant has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

### COUNT I

*Specific Performance*

65.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

66.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

67.     As described above, the TPP Agreement sent by Defendant to Plaintiffs constitutes a valid offer.

68.     By executing the TPP Agreement and returning it to Defendant along with supporting documentation, Plaintiff's accepted Defendant's offer.

69.     Alternatively, Plaintiff's return of the TPP agreement constitutes an offer. Acceptance of this offer occurred when Defendant accepted Plaintiffs' TPP payments.

70.     Alternatively, Plaintiff's return of the TPP agreement, along with the supporting documentation, TPP payments, and complete satisfaction of all conditions precedent to obtaining a permanent modification amount to the acceptance of Defendant's offer.

71.     Plaintiff's TPP payments to Defendant constitute consideration.   By making those payments, Plaintiffs gave up the ability to pursue other means of saving their homes, and Defendant received payments it might otherwise not have.

72.     Plaintiffs and Defendant thereby formed valid contracts.

73.     To the extent that the contracts were subject to a condition subsequent providing Bank of America an opportunity to review the documentation submitted by Plaintiffs when the returned the signed TPP, this condition was satisfied by Bank of America, as evidenced by the approval letter, and it is estopped to assert it as a defense to Plaintiffs' claims.

74.     Plaintiffs have performed all conditions, covenants, and promises required of them on their part to be performed in accordance with the terms and conditions of the contracts.   Moreover, Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make their modified payments.

75.     Defendant has failed and refused, and continues to fail and refuse, to perform the conditions of the contract on his part in that it has informed the Plaintiffs that

the permanent modification has been denied, and that the lower monthly payments will

no longer be accepted.

76.    Plaintiffs have no adequate legal remedy in that, absent specific

performance, Plaintiffs will be unable to continue making their monthly mortgage

payments and will likely lose their homes in foreclosure, and damages, if awarded, will

be inadequate to compensate Plaintiffs for their losses.

77.    The HAMP guidelines provide the blueprint for the specific performance

required, in cases such as this.  Pursuant to the MHA Handbook, Section 9.5, *Delayed*

*Conversion*,

> In situations where an eligible borrower successfully completed the trial
> period (including providing the required documentation and making the
> required payments) and should have been converted to a permanent
> modification, but for reasons beyond his or her control was not timely
> converted to a permanent modification....[t]he permanent HAMP
> modification offered must put the borrower in the same position as he or
> she would have been if the servicer converted the borrower to a permanent
> modification in accordance with the program requirements[7]....The servicer

---

[7]  Per the MHA handbook, to achieve this result, the servicer should take the following
steps:

- The Modification Effective Date is the date the modification would have
  become effective if the servicer had converted the borrower in a timely fashion,
  and the applicable Interest Rate Cap is the first Primary Mortgage Market
  Survey Rate, or "PMMS Rate", rounded to the nearest 0.125 percent, issued in
  the month prior to the Modification Effective Date.  For example, for a loan
  with a Modification Effective Date of June 1, 2010, the Interest Rate Cap should
  be 5.00 percent, which is the PMMS Rate issued in May, 2010 (the PMMS
  archives are available at www.freddiemac.com/pmms/docs/30-yr_historics.xls).
- The initial Unpaid Principal Balance ("UPB") of the modification should be the
  UPB of the loan as of the Modification Effective Date, plus all accrued but
  unpaid amounts allowed to be capitalized under HAMP as of the Modification
  Effective Date.
- Any payments made by the borrower after the Modification Effective Date until
  the time of conversion should be applied retroactively in accordance with the
  modified terms; however, any shortfalls between the actual payments made by
  the borrower after the Modification Effective Date (including any missed
  payments) and payments that are due under the modified terms until the time of

must take the necessary steps to correct any credit reporting for the borrower since the Modification Effective Date.

See MHA Handbook, Section 9.5, *Delayed Conversion*, attached as Exhibit 10.

## COUNT II

### *Breach of Contract*

78.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

79.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

80.     As described above, the TPP Agreement sent by Defendant to Plaintiffs constitutes a valid offer.

81.     By executing the TPP Agreement and returning it to Defendant along with supporting documentation, Plaintiff's accepted Defendant's offer.

82.     Alternatively, Plaintiff's return of the TPP agreement constitutes an offer. Acceptance of this offer occurred when Defendant accepted Plaintiffs' TPP payments.

83.     Alternatively, Plaintiff's return of the TPP agreement, along with the supporting documentation, TPP payments, and complete satisfaction of all conditions precedent to obtaining a permanent modification amount to the acceptance of Defendant's offer.

---

conversion must be advanced by the servicer, capitalized and deferred as a non-interest bearing amount that is due and payable by the borrower at the time of payoff, maturity or transfer.
See Handbook, Section 9.5, attached hereto as Exhibit 10.

84.    Plaintiff's TPP payments to Defendant constitute consideration.    By making those payments, Plaintiffs gave up the ability to pursue other means of saving their homes, and Defendant received payments it might otherwise not have.

85.    Plaintiffs and Defendant thereby formed valid contracts.

86.    To the extent that the contracts were subject to a condition subsequent providing Bank of America an opportunity to review the documentation submitted by Plaintiffs when the returned the signed TPP, this condition was satisfied by Bank of America, as evidenced by the approval letter, and it is estopped to assert it as a defense to Plaintiffs' claims.

87.    Plaintiffs have performed all conditions, covenants, and promises required of them on their part to be performed in accordance with the terms and conditions of the contracts.    Moreover, Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make their modified payments.

88.    Defendant has failed and refused, and continues to fail and refuse, to perform the conditions of the contract on its part in that it has informed the Plaintiffs that the permanent modification has been denied, and that the lower monthly payments will no longer be accepted.

89.    Plaintiffs have suffered harm and are threatened with additional harm from Defendant's breach.  By making TPP payments both during and after the TPP, Plaintiffs did not pursue other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home.  On information and belief, some putative class members have suffered additional harm in the form of foreclosure activity against

their homes and or being forced into accepting different modification agreements with less favorable terms.

## COUNT III

### *Breach of the Implied Covenant of Good Faith and Fair Dealing*

90.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

91.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

92.     Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

93.     "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp*., 441 Mass. 376, 385 (2004).

94.     Defendant routinely and regularly breaches this duty[8] by:

    a.     failing to perform loan servicing functions consistent with its responsibilities to Plaintiff;

---

[8] Bank of America ranks last in virtually every homeowner experience metric monitored by the Department of Treasury in its monthly Servicer Performance Report issued under the federal HAMP program, which is available at http://www.financialstability.gov/docs/Sept%20MHA%20Public%202010.pdf.
According to the October, 2010 report, which reflects data through September 2010, Bank of America has the worst speed to answer homeowner calls and the worst abandon rate, indicating that call centers are unable to handle the volume of consumer calls.  In addition, Bank of America has a higher than average complaint rate to a federal hotline and the worst time for resolving third-party complaints (e.g., from housing counselors) to the federal government.  Additionally, the Treasury Department recently cited Bank of America for failing to comply with requirements of the HAMP program and directed the Bank to make certain undisclosed changes in its procedures.
*See* http://www.nationalmortgagenews.com/nmn_features/boa-jpm-wells-told-comply-1021591-1.html (Oct. 8, 2010).

b.      failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

c.      routinely demanding information it has already received;

d.      making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP;

e.      failing to follow through on written and implied promises;

f.      failing to follow through on contractual obligations; and

g.      continuing to review the loan for a modification, after already sending out a letter of approval, while concurrently accepting payments and reassuring the Plaintiffs that the permanent modification was still in effect and paperwork evidencing that would be forthcoming.

95.    These actions constitute bad faith by the Defendant.

96.    On information and belief, the Defendant financially benefits from its breaches in a variety of way, including but not limited to: receiving compensation based on the total amount of assets under management, which would include the homeowners that are making payments because of their good faith belief they are being permanently modified; receiving HAMP payments while cutting corners by remaining woefully understaffed to perform the duties for which it is being paid; and the imposition of fees and charges on borrowers' accounts during and after their TPP.

97.    As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiffs harm.  By making TPP payments both during and

after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  Some members of the putative class also suffered additional harm in the form of foreclosure and collection activity against their homes.  Last, members of the putative class have been living in a state of stressful anxiety because of the limbo in which the Defendant has placed them.

## COUNT IV

### *Promissory Estoppel, in the alternative*

98.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

99.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

100.     Defendant, by way of its TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreement executed and with supporting documentation, and made their TPP payments, they would receive a permanent HAMP modification.

101.     Defendant's TPP Agreement was intended to induce Plaintiff's to rely on it and make monthly TPP payments.

102.     Plaintiffs did indeed rely on Defendant's representations.  It is undisputed that Plaintiff returned the executed TPP Agreement, along with the requested paperwork, and made the required payments, in compliance with the terms of the TPP.

103.     Given the language in the TPP Agreement, Plaintiff's reliance was reasonable.

104.    Defendant, by way of its approval letter, made a representation to Plaintiffs that they had satisfied the terms of the TPP and had qualified for a permanent loan modification.  Defendant's approval letters were intended to induce Plaintiffs into making additional payments beyond the expiration of the trial period.

105.    Plaintiffs did rely on the Defendants representations in the approval letter, and continued to submit monthly payments.

106.    Given the language in the approval letter, Plaintiffs' reliance was reasonable.

107.    Plaintiffs' reliance was to their detriment.   Plaintiffs were ultimately informed they were being declined a permanent modification under HAMP, notwithstanding the letters of approval to the contrary.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults.  Some members of the putative class also suffered additional harm in the form of foreclosure / collection activity against their homes.

## COUNT V

### *Negligence*

108.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

109.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

110.    The HAMP guidelines are, as a matter of law, the industry standard for the residential mortgage servicing industry:

> Standard Industry Practice.--The qualified loss mitigation plan guidelines (i.e., HAMP] issued by the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008 shall constitute <u>standard industry practice</u> for purposes of all Federal and State laws.

Helping Families Save Their Homes Act of 2009, Pub. L. No. 111-22 (2009), §201 (emphasis added).  (Attached in part as Exhibit 11.)

111.    The above section created a duty on the part of mortgage servicers, investors, and their agents to follow HAMP guidelines.

112.    The HAMP guidelines required Defendant to consider complainants for permanent loan modifications.  Once that determination was made, Defendant had a duty to Plaintiffs to offer each eligible homeowner a permanent modification.  Once offered by Defendant, and accepted and or relied upon by Plaintiffs, Defendant had a duty to honor the terms of the permanent modification.

113.    In disregard of its duty, Defendant apparently continued to review Plaintiffs' loans for modification eligibility, and then later declined each Plaintiff for a permanent modification.

114.    As a direct and proximate result of their negligence, Defendant caused damage to the Plaintiffs.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults.  Some members of the putative class also suffered additional harm in the form of foreclosure / collection activity against their homes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

a.      Certify this case as a class action and appoint the named Plaintiff to be class representatives and her counsel to be class counsel.

b.      Enter a judgment declaring the acts and practices of Defendant complained of herein constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members on the terms promised in class members' temporary modifications;

c.      Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the Class;

d.      Order specific performance of Defendant's contractual obligations together with other relief required by contract or law;

e.      Grant Plaintiff and the Class such other and further relief as this Court finds necessary and proper.


## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Plaintiffs,
By Their Attorneys,

*/s/ Matthew Forbes*
Matthew Forbes
BBO#642310
mforbes@forbesgallagher.com
Owen Gallagher
BBO#183420
ogallagher@gallagherlaw.com
Gallagher & Associates, PC
14 Summer Street
Malden, MA 02148
Tel:  (617) 598-3801
Fax: (617) 598-3900

Carlin J. Phillips
BBO#561916
cphillips@phillipsgarcia.com
Andrew Garcia
BBO#559084
agarcia@phillipsgarcia.com
Phillips & Garcia, P.C.
13 Ventura Drive
Dartmouth, MA 02747
Tel:  (508) 998-0800
Fax: (508) 998-0919

Dated:  March 4, 2011